NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar No. 13644
STEVEN W. MYHRE
Nevada Bar No. 9635
PATRICK BURNS
Nevada Bar No. 11779
Assistant United States Attorneys
United States Attorney's Office, District of Nevada
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336/Fax: (702) 388- 6418
John.P.Burns@usdoj.gov

*Representing the United States of America*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO.: 2:17-CR-00391-APG-VCF** |
| **Plaintiff,** | |
| | **GOVERNMENT'S SENTENCING** |
| **vs.** | **MEMORANDUM** |
| **FREDRICK J. LEAVITT,** | |
| **Defendant.** | |

The United States of America, by and through NICHOLAS A. TRUTANICH, United States Attorney, STEVEN W. MYHRE and PATRICK BURNS, Assistant United States Attorneys, hereby respectfully submits this Government's Sentencing Memorandum.

## I.    Relevant Procedural Background

On December 13, 2017, the grand jury in the District of Nevada returned an indictment charging Defendant Frederick "Rick" Leavitt (Leavitt) with one count each of Honest Services Fraud Conspiracy (18 U.S.C. § 1349) and Solicitation and Receipt of a Bribe by Public Official (18 U.S.C. § 201(b)(2)). On October 1, 2019, pursuant to a written plea agreement with the

government, Leavitt pleaded guilty to a superseding criminal information charging him with Honest Services Fraud Conspiracy and Conspiracy to Defraud the United States (18 U.S.C. § 371). In addition to the originally charge bribery conspiracy, the Section 371 count addressed a previously uncharged criminal tax fraud conspiracy. This Court set Leavitt's sentencing hearing for February 4, 2020. The government now submits this memorandum to aid the Court's sentencing decision.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**II.**   **Argument**

**A. Legal Standard for Determination of an Appropriate Sentence**

While the Sentencing Guidelines are no longer mandatory, they continue to play a critical role in accomplishing the Sentencing Reform Act's goal of "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46, 194 L. Ed. 2d 444 (2016) (quoting *Peugh v. United States*, 569 U.S. 530, 548, 133 S. Ct. 2072, 2087, 186 L. Ed. 2d 84 (2013) (internal quotation marks omitted)).

As the Court is aware, the framework for determining an appropriate sentence is set forth in 18 U.S.C.§ 3553(a), which requires that the Court ensure the sentence imposed properly

2

considers, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense and promote respect for the law; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentencing disparities. Post-*Booker*, the Ninth Circuit reviews a district court's sentencing decision to determine: (1) whether the district court properly calculated the applicable range under the advisory guidelines; and (2) whether the sentence imposed is reasonable. *United States v. Mohamed*, 459 F.3d 979, 985 (9th Cir. 2006) (citations omitted).

**B.   The Sentencing Guidelines as Applied to Leavitt's Bribery and Tax Fraud Conspiracies**

The parties have stipulated to recommend the guideline offense level calculation contained in the plea agreement. ECF No. 58 at 11:7-23. That calculation results in a total offense level of 21 after Leavitt receives a three-level reduction for acceptance of responsibility. With Leavitt being a Criminal History Category I, his guideline range of imprisonment under the parties' calculation is 37-46 months.

The Count 1 guideline calculation contained in the Presentence Report (PSR) prepared by Probation arrives at a total offense level of 23 and a guideline imprisonment range of 46-57 months. PSR at 27. The difference between Probation and the parties' total offense level is attributable to Probation applying the fourteen-level base offense level found at U.S.S.G. § 2C1.1(a)(1), rather than the twelve-level base offense level found at Section 2C1.1(a)(2). PSR ¶ 41. While the government acknowledges that Probation's construction of the guidelines is reasonable, it requests that the Court exercise its discretion to apply a total offense level of 21 as recommended by the parties. This plea agreement arose out of complex and extensive negotiations by the parties, and applying the parties' recommended total offense level would promote the important policy of encouraging the negotiated settlement of criminal cases.

/ / /

**C. The Section 3553(a) Factors Warrant Sentencing Leavitt to a 41-Month Term of Imprisonment**

    **a.  Nature and Circumstances of the Offense**

        **(i)  Leavitt's Bribery Conspiracy**

Leavitt was a high-ranking and influential public official within the United States Bureau of Reclamation (USBR). In the course of his almost two-and-a-half decade career at USBR he rose to become Director of the Financial Management Office (FMO) for USBR's Lower Colorado Region. Encompassing the Hoover Dam, the Lower Colorado Region is a critical part of the nation's infrastructure and natural resources. Serving as Director of the FMO since 2010, Leavitt oversaw approximately twenty employees organized into three groups: (1) the Budget Performance and Policy Group; (2) the Accounting Group; and (3) the Audit and Power Group. Based on this extensive supervisory experience in a major federal bureaucracy, Leavitt knew how the federal system worked. He knew the ethical requirements of a public official. He knew what a conflict of interest was. And he knew what constituted a bribe or a kickback. Knowing all that, and being entrusted with an official responsibility critical to the public welfare—the efficient and ethical administration of the nation's vital infrastructure—Leavitt chose to engineer an elaborate scheme to enrich himself at public expense.

The bribery scheme in this case was carried out in secrecy, intricately arranged, and ultimately inflicted a massive loss to the public agencies that were depending on the SCPPA audit process to be carried out ethically and in the public's interests. Leavitt and his co-conspirator, Dustin Lewis (Lewis), colluded heavily and continuously during the request-for-proposals stage to ensure the contract contained enough room to facilitate a substantial kickback. They also worked hard to ensure that Lewis's firm, LL Bradford & Company (LLB), enjoyed an unfair and decisive competitive advantage during the bidding process. Using his vast knowledge and

4

expertise culled from decades as a USBR official, Leavitt essentially wrote LLB's bid by exchanging drafts of the bid proposal with Lewis using a personal Google drive account. He and Lewis communicated frequently by using their personal telephones to call and text message about the bid proposal. Leavitt went so far as to provide Lewis a copy of the score sheet that the audit contract selectors (including Leavitt) would use to select the winning bidder. One witness described that conduct as being like Lewis and LLB having "the answers to the test" before taking the test. During all this scheming, Leavitt and Lewis concealed their collusion from USBR, the many entities composing SCPPA, the Western Area Power Authority (WAPA), and the other bidding companies.

Once LLB was awarded the contract through this corrupt arrangement, and as SCPPA transferred hundreds of thousands of dollars to LLB as payment, Leavitt's co-conspirator, Lewis, funneled bribes of over $200,000 through various entities to Leavitt's personal and family trust accounts. Once the contract's performance was underway with LLB conducting the audit and SCPPA paying the contract price, Leavitt used his official position at USBR and on the audit subcommittee to approve incremental monthly payments to LLB under the contract. Knowing that he had rigged and corrupted the process, Leavitt provided his required concurrence in the payment of $133,334, and, on four separate occasions, $67,667. In total, the bribe scheme caused SCPPA to pay out $704,002.

*The First Bribe Payment*

Lewis and a partner from LLB provided the first payment to Leavitt immediately after the SCPPA audit contract was awarded to LLB on April 28, 2015. This was prior to the written contract between SCPPA and LLB being signed and also prior to LLB's receipt of any SCPPA money. The first payment was for $87,500, which was exactly 10% of the $875,000 price for the SCPPA audit contract. The $87,500 originated from an account in the name of A-Team

Consulting, LLC (A-Team Consulting), an entity owned in part by Lewis's corporation, Solomon Consulting, Inc. (Solomon Consulting).

On April 29, 2015, an LLB partner, Person #1, personally signed authorization for the wire transfer of $87,500 to be deposited into an account in Solomon Consulting's name at Talmer West Bank located in Troy, Michigan. The Talmer account only had a balance of $308.61 at the time it received the $87,500 wire. The next day, on April 30, 2015, Lewis initiated an $87,500 wire transfer from that account to a JP Morgan Chase bank account in the name of the Leavitt Family Trust, which was controlled by Leavitt. On that same day, in an apparent decision to reward himself, Leavitt put a $5,000 down payment on a Mercedes Benz CLS 63 AMG luxury sports sedan. That sports car had a purchase price of $120,063.25. The series of transactions is represented here:



### The Second Bribe Payment

LLB first started receiving payments under the SCPPA audit contract on June 30, 2015. The first payment to LLB was an initial $300,000 down payment on the contract, and was to be followed by a number of subsequent partial payments upon USBR/SCPPA's receipt and

approval of invoices from LLB. On the same day LLB received the $300,000, June 30, 2015, Lewis text messaged Leavitt asking, "Can you send me your wiring instructions again[?]" The next day on July 1, 2015, Lewis personally signed for a $152,500 wire transfer from A-Team Consulting's Meadows Bank account to Solomon Consulting's Talmer West bank account. Prior to the transfer, the Solomon Consulting account had a balance of $1,490. On that same day, Leavitt's wife wrote Fletcher Jones Imports a $115,063.25 check for the balance of the Mercedes Benz luxury sports car. On the day she wrote that check the Leavitt's account balance was $101,512.26, $13,550.99 short of covering the check to Fletcher Jones Imports. The next day, July 2, 2015, Lewis wired $113,750 to a JP Morgan Chase account controlled by Leavitt. Lewis text messaged Leavitt saying, "Just sent wire. Will call in about 30 min." The check for the Mercedes Benz cleared four days later on July 6, 2015.[1] This series of transactions is visually represented here:



---

[1] Leavitt elected to take "European delivery" of the Mercedes sports car, which meant he and his wife traveled to Europe where they accepted delivery of the car, toured through Europe, and the then left the car with a shipper who would deliver the vehicle to them in the United States.

1

*Leavitt and Lewis's Plan to Obtain Even More Public Money from SCPPA*

Text messages between Lewis and Leavitt during October 21-30, 2015, show the two men discussing "finding more [Bureau of Reclamation] work." Lewis stated to Leavitt that in such an event, "We can definitely add to the comp on that[.]" Leavitt responded that he "opened that door yesterday in Phoenix with all the current customers and the new ones for doing the annual audits[,]" and advised Lewis that "[a] new task is going to be discussed with you at 10." Lewis responded, "Sweet…Why is it you are the only person at [Bureau of Reclamation] that makes things happen?" Leavitt then advised Lewis that Lewis "needs to expand the scope" of the SCPPA audit contract, and told Lewis to "call me after and I can give you the back story."

A later examination of Leavitt's computer showed more evidence of collusion well after the SCPPA audit contract had been awarded and was being performed. Lewis and Leavitt conspired to persuade SCPPA to award an expanded contract to LLB. This expansion of the contract would pay an additional $300,000 for purposes of audit services provided during the interim between the end of the prior contract and the beginning of the new one. Leavitt's computer contained an email from his personal email address to Lewis; the email contained draft text for an email from Lewis to SCPPA proposing an expansion of the contract to encompass that interim period. The lengthy text was preceded with a line from Leavitt, stating, "Let me know your thoughts…" The email was sent on February 8, 2016 while Leavitt was still technically employed by USBR, but had started working at LLB.

*Leavitt's Tax Partner Position with LLB While Still Employed at USBR*

While his bribe scheme with Lewis was progressing and LLB was being enriched by the progress payments that he approved, Leavitt was negotiating with Lewis and Lewis's LLB co-owners to become a partner at LLB.  Text messages show Lewis arranging dinner meetings with Person #1, LLB's controlling partner, and Leavitt in early October. On November 3, 2015,

8

1    Leavitt texted Lewis to ask if he could "stop by tomorrow and check out the [LLB] office[.]" The

2    next day, Lewis informed Leavitt via text message that he had asked another LLB partner "for

3    [a] copy of the partner agreement." Later in the day, Leavitt text messaged Lewis and asked him

4    if he was "available for a call [] with the [Western Area Power Authority] to discuss adding in

5    the visitor facility repayable advance." While Leavitt was arranging to become a partner at LLB,

6    he and Lewis continued into mid-November discussing expanding the SCPPA audit contract as

7    evidenced by a November 17, 2015 text message from Lewis to Leavitt asking for "[a]ny updates

8    for the Visitor Center procedures?" Text messages on December 7-8, 2015, further reflect Lewis

9    arranging a meeting between Leavitt, Person #1, and himself at a Starbucks. Leavitt would

10    eventually tender his resignation to USBR, but not before he took efforts to ensure that he could

11    "burn off" all his accrued sick and comp time leave. He took that leave, continuing to receive his

12    federal paycheck and benefits while working fulltime in his new position as LLB's tax partner.

13    *Leavitt's False and Misleading Statements When Interviewed About the Bribe Conspiracy*

14        On February 18, 2016, FBI, IRS-CI, and Department of Interior-OIG agents executed a

15    search warrant and conducted interviews at LLB's office located at 8880 W. Sunset Road. Leavitt

16    was present at LLB in his new position when the search warrant was executed, and he agreed to

17    participate in an interview with FBI and DOI-OIG agents. Leavitt repeatedly lied during the

18    interview. Leavitt initially denied being substantively involved in the SCPPA audit contract

19    award. He claimed to have completely recused himself from the contract bidding process for the

20    sake of "independence," instead  delegating the project work to his subordinates. Leavitt denied

21    the essential facts of the bribery scheme, claiming that he: (1) was not involved in the decision-

22    making process that resulted in selection of LLB; (2) did nothing to steer the contract toward

23    LLB; and (3) did not receive anything in exchange for the contract being awarded to LLB.

24        When confronted with the financial records showing the bribe payments, Leavitt finally

admitted to significant parts of his conduct in colluding with Lewis to arrange a kickback through steering the audit contract to LLB. His admissions, however, were also coupled with outright lies, minimizations, and a concerted effort to conceal the payment Lewis received as part of the Collision Authority tax fraud scheme (discussed below). For instance, Leavitt tried to portray the bribes he received as "repayment" of an "investment" he had made with Lewis. When questioned about the nature of this "investment," Leavitt was unable to give specific details about what type of business activity in which he had invested the $500,000. He stated, "It was an investment towards uh, going in towards a new entity of developing a new entity that would be able to get us money. I don't know the specifics. I trust him." Leavitt was clearly lying about any investment because the $500,000 he was referring to was money paid to Lewis and another individual relating to the Collision Authority tax fraud scheme. It was not an investment and the bribes were not a "repayment" of an investment. Leavitt at no time explained to the agents that he had orchestrated a multimillion dollar tax fraud with Lewis.

### (ii)    Leavitt's Tax Fraud Conspiracy

In an entirely separate criminal conspiracy also conducted with Lewis, Leavitt used his financial acumen as a CPA and experience on the board of a publicly traded real estate investment entity to engineer a multimillion dollar tax fraud scheme. Using the same methods of surreptitious communication and financial transfers, Leavitt victimized the public a second time by effectively stealing millions of dollars in tax revenue from the U.S. Treasury and the tax-paying public. In addition to that, Leavitt exploited his long-time clients who relied upon and trusted him to prepare their taxes ethically, legally, and in their best interests. He violated that trust and those clients will now be saddled with a multimillion dollar tax bill and any associated interest and fines. This tax fraud conspiracy was beyond sophisticated with many moving parts and a great degree of calculation and planning.

1

2          *Background Concerning Collision Authority and Leavitt's Involvement with Its Business*

3          Collision Authority was the shorthand for six auto body stores located in Southern

4   Nevada. Each store was operated by one of the following entities: (1) Acu-Hon Corp (AHC); (2)

5   Collision Authority Centennial (CAC); (3) Collision Authority Findlay Location LLC (CAF);

6   (4) Collision Authority –North Las Vegas LLC (CANLV); (5) Collision Authority Spring Valley

7   LLC (CASV); and (6) SPRT TRKS, Inc. (ST). Those businesses were pass-through entities for

8   tax purposes with their income passing through to Collision Authority's owners. The Collision

9   Authority business was started by a person named W.F.

10         Tax Payer #1 (TP #1)  began working as an estimator for W.F. sometime in 1991. When

11  the second Collision Authority location opened, TP #1 became a partner with W.F. with a 55%-

12  45% ownership split. Around 1993-1994, Tax Payer #2 (TP #2) began working at one of the

13  Collision Authority locations as a parts employee and later as the manager. When the third

14  Collision Authority business was opened, TP #2 was granted a 10% ownership interest in the

15  entire business. In April 2013, W.F. passed away. TP #1 and TP #2 appear to have purchased

16  W.F.'s portion of Collision Authority from his widow. The six entities were all S corporations

17  whose income flowed through to their owners, TP #1 and TP #2.

18         Leavitt met W.F. sometime in the mid-1990s and developed a friendship with him. In

19  1999, Leavitt began working as an external CPA for Collision Authority. Leavitt and W.F.

20  formed Auto Body Group, LLC (ABG), which was an entity used to pay the collective expenses

21  of the six Collision Authority centers. Each of the six centers paid money each month to ABG,

22  which was used to pay for advertising costs and Leavitt's accounting fees. Leavitt received

23  monthly payment for his services, which usually amounted to $4,000-$5,000 each month. Leavitt

24  was responsible for preparing the tax returns for the Collision Authority entities and he also

prepared the individual 1040 income taxes for TP #1 and TP #2. In 2013, after W.F.'s death,

1  Leavitt was the 100% owner of ABG.

2          _Sale of the Collision Authority Business_

3        Sometime in 2012, and prior to W.F.'s passing, W.F., TP #1, and TP #2 entered into

4  negotiations to sell Collision Authority to a Texas-based company, Service King Paint and Body,

5  LLC (Service King).  On December 27, 2013, TP #2 and TP #1 completed the sale of Collision

6  Authority to Service King for a purchase price of $22,762,002. That price was apportioned among

7  the six Collision Authority entities with five of the entities recognizing significant profits. Leavitt

8  was involved in the sale to the extent of providing consulting services during the sale process and

9  assisting when Service King's accounting firm audited Collision Authority's books.

10          _Background Concerning Vestin Realty Mortgage II, Inc._

11        Organized in 2001, Vestin Realty Mortgage II, Inc. (VRM), was a Maryland corporation

12  operating out of a building located at 8880 W. Sunset Road, Las Vegas, Nevada, the same

13  building LLB occupied. In 2013, VRM was a publicly traded company investing in real property

14  mortgages or deeds of trust and also investing in, acquiring, or managing real property or entities

15  that engage in such activities. VRM previously operated as a real estate investment trust (REIT).

16  In 2013 VRM managed other REITs and real estate entities, including MVP REIT, Inc. and

17  various other MVP-branded entities. In 2013, Person #2 was VRM's President, Chief Executive

18  Officer, and Chairman of its board of directors. VRM itself was managed by Vestin Mortgage,

19  LLC (Vestin Mortgage), a Nevada limited liability company managed and majority owned by

20  Person #2.

21        Dustin Lewis and an LLB partner, Person #1, were both involved with Person #2 in

22  various real estate and investment entities. Since 2009, and throughout 2014, VRM employed

23  Strategix Solutions, LLC (Strategix) for accounting services. Strategix was an entity managed by

24  LLB and Lewis. Lewis worked closely with Person #1 and Person #2 regarding Vestin and MVP

entities, and worked as the Chief Financial Officer of MVP REIT, Inc. Lewis also served as the

Senior Vice President of Acquisitions for MVP Realty Advisors, LLC. LLB prepared the tax

filings for MVP REIT, Inc. and other Vestin/MVP entities. Leavitt was also on VRM's board of

directors for approximately ten years and VRM's 10-K for 2013 stated that it relied on him for

his accounting experience and input regarding its financial reporting and internal controls.

Leavitt also chaired VRM's audit committee. Leavitt had similar positions on VRM's sister

corporation, Vestin Realty Mortgage I, Inc.

Throughout its operation, VRM sustained tens of millions of dollars in losses on its real

estate assets. As of 2013 VRM had accumulated approximately $200,000,000 in net operating

losses related to its real estate investments. Those losses were too great to be used for VRM's own

tax benefit as deductions on its return.

### The Tax Fraud Conspiracy Relating to Collision Authority and VRM

During his work on the sale of Collision Authority and preparation of its entities' tax

returns, Leavitt convinced TP #1 and TP #2 to pay him $1.6 million. That payment was in

exchange for Leavitt arranging a large tax deduction which would significantly offset the taxes

due and owing from the sale. TP #1 and TP #2, who lacked knowledge regarding tax and

accounting matters, relied on Leavitt and agreed to make the payment so they could obtain what

they believed to be "tax credits." To execute this scheme, Leavitt and Lewis conspired to file false

tax returns for the Collision Authority entities, which would claim millions of dollars in false

deductions based on a non-existent purchase of an interest in VRM.

Leavitt and Lewis (who prepared the tax filings for VRM) coordinated with one another

to file false returns on behalf of Collision Authority and VRM, respectively. Text message

evidence shows Leavitt and Lewis just inventing a random number for the false deduction. To

create the false deduction, Leavitt issued 1099 forms to VRM, which falsely purported to show

the Collision Authority entities paying VRM an aggregate of $11,136,678 for non-employee compensation. No such payments ever took place. Indeed, not one dime of money was ever exchanged between Collision Authority and VRM. In preparing the Collision Authority entities' 2013 1120S tax returns, Leavitt attached Forms 4797 (Sales of Business Property) to reflect the non-existent payments to VRM as deductions for business expenses related to preservation of "goodwill."[2] Those false deductions appear in the following fashion among the six Collision Authority entities:

| Collision Authority Entity | "Goodwill" Deduction for "Payment" to VRM | False Line Item in 1120S | Underreported Capital Gain on TP #1's 1040 Tax Return a/f False Deductions | Underreported Capital Gain on TP #2's 1040 Tax Return a/f False Deductions | Tax Loss to U.S. |
|---|---|---|---|---|---|
| AHC | $315,910 | $351,151 -W1-12, at 10 | -- | -- | -- |
| CAC | $4,738,658 | $5,267,266 | -- | -- | -- |
| CAF | $303,163 | $336,982 - W1-16, at 10 | -- | -- | -- |
| CANLV | $303,163 | $336,982 – W1-18, at 10 | -- | -- | -- |
| CASV | $3,475,015 | $3,862,662 – W1-20, at 10 | -- | -- | -- |
| ST | $2,000,769 | $2,223,957 W1-22, at 10 | -- | -- | -- |
| **Total:** | $11,136,678 | $12,379,000 | $6,526,603 | $4,610,076 | $2,230,172 |

Leavitt personally signed and filed with the IRS those six false 1120S tax returns.

Leavitt also prepared false personal income tax returns for his two clients, TP #1 and TP #2. He signed and filed 2013 Forms 1040 for each, which together reported only a $2,844,106 gain on the sale to Service King. The actual gain from the sale was $13,980,785. This resulted in

---

[2] Payments to preserve goodwill of a business are deductible under 26 U.S.C. § 162. *See, e.g., Lutz v. Commissioner*, 282 F.2d 614, 615 (5th Cir. 1960) (payments to protect "credit and standing in the industry" deductible); *L. Heller & Son, Inc. v. Commissioner*, 12 T.C. 1109 (1949) (taxpayer's payments in satisfaction of bankrupt subsidiaries' debts deductible as business expenses because were expended to protect taxpayers' reputation in business community).

14

an underreporting of $11,136,678 in income. The false information was incorporated into the Schedule Ds for TP #1 and TP #2's returns. Those false returns had the effect of reducing the taxable income of the entities and creating an underpayment of tax in the amount of $2,230,172.

For his part, Lewis prepared and filed a false 2013 Form 1120 tax return for VRM. This false return was designed to record the other side of the phantom payments from Collision Authority to VRM. Lewis recorded the $11,136,678 in "payments" reflected in the false Collision Authority 1099-MISCs and returns as gross receipts on VRM's 1120 tax return. Because VRM had a net operating carryover loss of $193,858,418, the $11,136,678 in "payments" from Collision Authority had no effect on VRM's taxable income for its 2013 tax liability. The phantom income was washed out by VRM's hundreds of millions of dollars in operating losses.

*Financial Records Showing Leavitt's Distribution of the Tax Fraud Proceeds to Lewis, Person #1, and Person #2*

On December 27, 2013, Service King sent wire transfers of $1,750,000 and $85,677.42 into ABG's Chase business checking account. Leavitt was the managing member for the account with full signatory authority. That same day, Leavitt caused $1.6 million to be wire transferred from the ABG account to a Chase account in the name of the TR Leavitt Family Trust. Leavitt and his wife, are trustees of the Leavitt Family Trust.[3]

Seven days later, on January 3, 2014, Leavitt transferred $800,000 of the proceeds to a second Chase account in the name of the TR Leavitt Family Trust. He then immediately transferred $500,000 to A-Team Consulting's Meadows Bank account. As noted above in discussing its role in the bribery scheme, A-Team Consulting is an entity owned by Lewis, Person #1, and a third LLB partner. Leavitt also immediately made a second wire transfer of $300,000

---

[3] Leavitt's CPA firm also received a separate $150,000 payment for his accounting services.

to the Talmer West Bank account in the name of Lewis's entity, Solomon Consulting, LLC. Lewis ultimately ended up personally keeping $400,000 in proceeds from the tax fraud conspiracy, and distributing another $100,000 and $300,000 to Person #1 and Person #2, respectively.

*Leavitt's False Entity and Personal Income Tax Returns Deducting the Distribution of the Tax Fraud Proceeds as Fake Business Expenses*

In addition to causing the filing of false returns for the six Collision Authority entities and TP #1 and TP #2 as individuals, Leavitt also filed a false 2013 1120S tax return for ABG. Leavitt owned ABG and received pass through income from it, which he was required to file on his tax return. To reduce the taxable income he realized from the $1.6 million received from ABG, Leavitt filed a false tax return for ABG, which wrote off as "commissions," i.e., business expenses, the $1,450,000 transferred to himself, Lewis, Person #1, and Person #2. Under 26 U.S.C. § 162(c)(1)(2), illegal payments such as those are not deductible business expenses.[4] The false ABG return and Leavitt's resulting false 1040 personal income tax return created an additional tax loss to the United States of $584,770. In total, to carry out the tax fraud conspiracy, Leavitt filed ten false tax returns with the IRS (not including the false VRM tax return filed by Lewis).

**b. History and Characteristics of the Defendant**

Leavitt is an intelligent, sophisticated person who is highly experienced in financial matters and the operation of the federal bureaucracy. While working full-time as the Director of FMO, where he was responsible for multiple departments and numerous subordinates, he

---

[4] ("No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business.").

16

managed to carry on numerous other businesses. He operated a side CPA business where he prepared taxes and performed accounting for various businesses. He operated an autoglass business. He sat on the board of a publicly traded real estate investment business for which he provided accounting and financial work. Leavitt amassed significant wealth in the process, accumulating millions of dollars in assets. At one point he owned his own airplane, which he piloted throughout the country. He built a 4,000 square foot home on an acre-lot in a tony Henderson neighborhood surrounded by other million-dollar homes. And he did all this in spite of what he reports as a highly challenging and unpleasant childhood.[5]

Despite all of these vocational and material accomplishments, Leavitt demonstrated a greedy materialism that led him to commit serious crimes. Leavitt's greed was not confined to these two criminal schemes. In the words of Leavitt's former brother-in-law and USBR subordinate, Leavitt "was the type of person who never did anything for anyone without seeking something in return." Discovery Bates Stamp #: 71979. Leavitt enjoyed great financial and professional success, but he nevertheless decided to commit these very serious public corruption and tax fraud schemes because that material success was not enough for him. Leavitt's conduct of immediately purchasing a high-end luxury sports car with the bribe money demonstrates that Leavitt discarded his ethical obligations and the public trust for self-indulgent material gratification.

---

[5] To the extent Leavitt claims his reportedly poor childhood warrants leniency, courts have repeatedly declined to apply a defendant's troubled upbringing as a basis for leniency. *See, e.g.*, *United States v. Francisco*, 2012 WL 3150319, at *12 (D.N.M. 2012) (declining to depart downward based on the defendant's "lack of guidance in his youth" and noting "[p]oor or absent parents are an unfortunate reality of the criminal justice system"); *United States v. Albert*, 2008 WL 4104117, at *14 (D.N.M. May 7, 2008) (declining to depart downward and noting that "[u]nfortunately, many of the defendants before the Court have bad relationships with their father or do not have a father present, or other issues of that magnitude"); *United States v. Wetzel- Sanders*, 2005 WL 2464572, at *2 (D. Kan. Sept. 28, 2005) (finding that the defendant's history, which included childhood abuse, institutionalization, and suicidal thoughts, did not warrant a downward departure).

Leavitt's intellect, sophistication, and vast experience as a federal bureaucrat means he should be shown less leniency. "Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). Moreover, it means little in this criminal context that Leavitt does not have prior felony convictions. Leavitt's status as a first-time offender is not atypical; the same can be said of 90% of those convicted of federal bribery offenses and more than 82% of those convicted of federal tax offenses. *See* United States Sentencing Commission, *Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category*, FY 2014, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2012/Table14_0.pdf (accessed January 23, 2020). Moreover, Leavitt's lack of prior criminal history receives little weight for an additional reason: he committed multiple, distinct criminal conspiracies so he is actually a multi-time offender. Leavitt has been shown leniency by the government through its agreement to recommend concurrent time between Counts 1 and 2, but that should not obscure the fact that Leavitt is not actually a "first time offender" as that term is commonly understood.

The Court's consideration of Leavitt's history and characteristics must also extend to his employment and work history. *See, e.g.*, *United States v. Hoang Mung Thai*, 231 F. App'x 675, 676 (9th Cir. 2007) (noting district court was required to consider under 3553(a)(1) defendant's employment history). The portrait that emerges from interviews with Leavitt's USBR supervisors and subordinates is not at all flattering. Witnesses describe Leavitt as an imperious, volatile, and unstable person with a penchant for threatening his subordinates with adverse employment actions and criminal referrals. T.F., the Regional Director of the USBR's Lower Colorado Region and Leavitt's ultimate supervisor, described Leavitt to investigators as "volatile, emotional, and

high strung[,] …extremely needy[,]…extremely immature and often childish with respect to his behavior in the workplace." Discovery Bates Stamp #: 10436. T.F. described that Leavitt "has a problem working with, and for, women and has been involved in 'peer mediation' twice in recent years as a result of issues interacting with female employees." *Id.* at 10437. He further described "Leavitt's regular threats to other co-workers and USBR employees with various forms of litigation and/or filing complaints with the Office of Inspector General (OIG) when they disagreed with him." *Id.*  One of Leavitt's subordinates, C.C., described Leavitt "harassing her about her son being hired at Hoover Dam" because C.C. had not told Leavitt in advance; Leavitt—who would take more than $200,000 in bribes from his friend Lewis—baselessly considered the son's hiring to present a conflict of interest. Discovery Bates Stamp #: 685-686. C.C. ultimately filed an EEOC complaint against Leavitt after he "disrespected" her at a gathering at his house in front of FMO staff members and their families. *Id.* Yet another USBR employee, B.N., described Leavitt as frequently "screaming" at other USBR employees and noted "a lot of people are afraid of him" retaliating when disagreements arise. *Id.* at 679. She further described that conflicts with Leavitt have "caus[ed]multiple employees to take a downgrade in pay/position, and others to resign simply to get away from Leavitt." *Id.*

### *The Court Should Place Little Weight Upon Third Party Endorsements Alleging Leavitt's Good Character*

The government expects Leavitt to present numerous character letters or attempt to call character witnesses at his sentencing hearing. While the Court is not prevented from taking those endorsements into account, such attestations to Leavitt's good character would not distinguish him from the typical defendant in a white collar crime case. As Judge Victor Marrero of the Southern District of New York observed in another case, such a collection of endorsements:

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model

1
2
3
4

> citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. *United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).

5
6
7
8
9
10
11
12

*See also United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"); *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)).

13
14
15
16
17
18
19
20
21
22
23
24

Sentencing courts should reject the notion that highly successful white collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status or lesser standing in the community. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States*

v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). As the Seventh Circuit has observed, treating white-collar criminals on the same plane as other classes of offenders is essential to ensuring just outcomes:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature.
> *Stefonek*, 179 F.3d at 1038 (citation omitted).

Leavitt's history and characteristics do not warrant any leniency in this case. In fact, they militate in favor of imposing a lengthy prison sentence.

### c.  Need to Reflect the Seriousness of the Offense and to Promote the Rule of Law

### i)    Leavitt's Bribery Conspiracy

More than fifteen years ago, the Sentencing Commission increased the offense levels applicable to public corruption offenses. *See* U.S.S.G. Manual app. C (Amendment 666), available at https://www.ussc.gov/guidelines/amendment/666 (accessed January 24, 2020). In enhancing the guideline exposure for public corruption offenses, the Commission was clearly recognizing the threat to the integrity of democratic processes caused by such crimes. In amending the public corruption guideline, the Commission stated:

> This amendment increases punishment for bribery, gratuity, and "honest services" cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses. This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses. . . . The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes.
> *Id.*

21

1

2      Bribery and honest services fraud are among the most important crimes for which this

3   Court will be called upon to impose sentence. The integrity of the United States' public

4   institutions is what distinguishes it from failed or failing states that lack rule of law institutions.

5   It is the foundation upon which public goods flow to those most in need in our society. On a

6   normative level, official corruption destroys the public's faith in government, and it chills public

7   participation by sending the message that governmental action comes with a price tag that only

8   those with money can pay. The Eleventh Circuit eloquently described this corrosive effect of

9   bribery:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.
> *United States v. Hayes*, 762, F.3d 1300, 1309 (11th Cir. 2014).

13  These rule of law concerns and policies are no more pronounced than in a federal bribery case

14  like Leavitt's. The sentence the Court imposes must be calculated to strongly vindicate such

15  concerns vital to our public institutions.

### ii)    Leavitt's Tax Fraud Conspiracy

17      Tax fraud is theft from the pockets of every taxpaying citizen of this nation. The Supreme

18  Court has long-recognized that "[t]he United States has relied for the collection of its income tax

19  largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax

20  from him by those from whom income may be received." *Spies* v. *United States*, 317 U.S. 492, 495

21  (1943). A functioning government relies on its citizens and residents to report timely, completely,

22  and honestly all the taxes they owe, which is why Congress has made it a criminal offense to file

23  false returns or evade income taxes. *See United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006)

24  ("The criminal tax laws are designed to protect the public interest in preserving the integrity of

22

the nation's tax system."). As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

Here, Leavitt used his immense acumen with accounting, tax, and financial matters to concoct a sophisticated tax fraud scheme, which might have gone undetected but for law enforcement's bribery investigation. It is problematic enough for the U.S. Treasury when individual taxpayers flout and evade their tax obligations. The problem becomes many times worse when a skilled CPA and tax preparer like Leavitt defeats the payment of taxes through an elaborate false return scheme. Moreover, Leavitt defrauded not just the IRS, but his clients as well who were depending on him to guide them through a complex financial transaction involving their life's work. Now they are left with the expensive and burdensome task of extricating themselves from an entanglement of fraudulent tax reporting.

### d.  Need to Afford Adequate Deterrence

#### (i)      Leavitt's Bribery Conspiracy

One congressional purpose in enacting 18 U.S.C. § 3553 was to ensure that serious white-collar crimes are more likely to be punished by imprisonment. *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259. Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," those crimes are "prime candidate[s] for general deterrence." Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L.REV. 721, 724 (2005). Defendants committing white-collar crime often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); 18 U.S.C. § 3553(a)(2)(B). Lenient sentences send the message to potential white-collar criminals that, if caught, all they stand to lose are their ill-gotten gains and "practically none of

their liberty." *Id.* That is no deterrence at all. Only a custodial sentence can deter substantial, premeditated economic crime. *See Musgrave*, 761 F.3d at 609; *United States v. Peppel*, 707 F.3d 627, 638 (6th Cir. 2013); *see also United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J. concurring and dissenting) ("It is precisely at this point-when the thief of above-average education and wit is deciding whether to do the deed -- that reflection on probable prison time-general deterrence-can have an effect.").

Sentencing for public corruption offenses in particular must account for the need to send a strong deterrent message. Such efforts at deterrence can work. As Judge Ruben Castillo of the Northern District of Illinois observed:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.
> *United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill.), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

This Court is in a position to send a strong deterrent message to other public officials contemplating a breach of their ethical and legal responsibilities.

### (ii)    Leavitt's Tax Fraud Conspiracy

General deterrence is particularly important in cases like Leavitt's because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at*

https://www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf. This means that hundreds of billions of dollars are lost every year because in part people such as Leavitt encourage and enable others to flout their obligations while enjoying all the myriad public goods underwritten by the tax-paying portion of the public. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence. Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in tax fraud. And studies confirm that such criminal tax sentences have a tangible deterrent effect on violations of the revenue laws. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The scarcity of tax prosecutions in a sea of noncompliance strongly heightens the deterrent impact and importance of each criminal tax sentencing. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.
> U.S.S.G. ch. 2, pt. T, introductory cmt.

Put simply, where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. As Judge Edward Weinfeld aptly observed in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants

25

are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community. *United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).

Judge Paul G. Gardephe echoed this view in a more recent case:

Our tax system is, at bottom, a voluntary one. Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.
*United States* v. *Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50).

*See also United States* v. *Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); *United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In the case of CPAs and tax preparers like Leavitt, salient examples of such professionals being sent to prison do not go unobserved by the others within their field. In light of a CPA's potential to enable and mislead numerous others to commit tax fraud, a powerful deterrent message must be sent.

### e.  Need to Avoid Unwarranted Sentencing Disparities

In order to "to promote national uniformity in sentencing[,]" Congress enacted 18 U.S.C. § 3553(a)(6), the sentencing factor regarding "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United*

*States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007). *See also United States v. Florez*, 447 F.3d 145, 157 (2d Cir. 2006) (primary goal of § 3553(a)(6) is to minimize sentencing disparity at the nationwide level). Likewise, "[t]he purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) (citation omitted). To present "[a] well-founded claim of disparity," a defendant must compare apples to apples, *United States v. Mateo-Espejo*, 426 F.3d 508, 514 (1st Cir. 2005), and the myriad factors that come into play at sentencing make it difficult to isolate "identically situated" co-defendants. *United States v. Rivera-Gonzalez*, 626 F.3d 639, 648 (1st Cir. 2010).

In its August 2019 publication regarding sentencing statistics for bribery offenses in Fiscal Year 2018, the United States Sentencing Commission (USSC) reported that 83.8% of all offenders convicted of such crimes were sentenced to prison. United States Sentencing Commission, Quick Facts – Bribery, p.1, *available at* https:// www. ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts /Bribery_FY18.pdf (accessed January 24, 2020). The average sentence for bribery offenders was 27 months in prison. *Id.* That statistic includes a large number of offenders receiving substantial assistance or other departures downward, as well as those receiving downward variances and defendants who were not public officials. *Id.* at 2. Eighty-seven percent of bribery offenders had little or no criminal history and fell into Criminal History Category I. The median bribery loss amount in all cases was $23,500, with 46.5% of cases involving loss amounts of $15,000 or less, and 26.4% involving amounts greater than $150,000. *Id.* The average age of a bribery offender was 48 years old. *Id.*

Here, Leavitt's case is much more serious than the average bribery case. He accepted $201,250 in bribe money, almost nine times the amount in an average bribery case. Moreover, he and Lewis had plans to cause SCPPA to pay out another $300,000, with Leavitt no doubt getting a healthy portion of that amount. Further, the bribe scheme caused SCPPA to actually

pay out a total of $704,002 to LLB. That entire amount was a complete loss to SCPPA since it had to scrap any work LLB had performed under the contract due to the tainted selection process.

As to the guideline applicable to Leavitt's sentencing for his tax fraud conspiracy, U.S.S.G. § 2T1.1, the United States Sentencing Commission has commented that the "guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length." U.S.S.G. § 2T1.1 cmt. background. According to the Sentencing Commission, the national average sentence length for criminal tax violators is 17 months in prison. *See* United States Sentencing Commission, Quick Facts: Tax Fraud Offenses (2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quickfacts/Tax_Fraud_FY17.pdf (accessed January 24, 2020). The average guideline minimum for criminal tax offenders nationwide was between 24-26 months. *Id.* The Sentencing Commission states that 87.2% of criminal tax offenses involved tax losses of $1.5 million or less, and that the median tax loss for those offenses was $277,576. *Id.*

In Leavitt's case, a sentence of much greater than the average 17 months is needed in order to achieve the purposes of sentencing, but also to avoid creating a gross disparity with nationwide sentencing outcomes. First, at $2,230,172, the tax loss Leavitt inflicted is eight times that of the median average tax offender. Second, as explained above, Leavitt used sophisticated means to commit his offense. Nationwide, only 12.5% of tax offenders used sophisticated means as Leavitt did. *Id.* Third, Leavitt used a special skill to commit his crimes. Nationwide, only 3.8% of tax offenders abused a position of trust or employed a special skill to commit their crimes as Leavitt did. *Id.* For these reasons, Leavitt's tax crimes are uniquely bad relative to the average nationwide offense characteristics and guidelines ranges. Thus, a disparity would be created if Leavitt was to be treated as the average tax offender whose typical offense conduct is not as serious. Criminal tax offenders inflicting much less tax loss than Leavitt frequently receive

28

lengthy sentences greater than what is recommended by the government in this case. *See* Chart of Sentencing Outcomes in Criminal Tax Cases, attached here as Exhibit 1.

### III.   <u>Conclusion</u>

WHEREFORE, after consideration of the included facts, points, authorities, exhibits, and arguments, the United States respectfully requests that this Court sentence Leavitt to 41 months in prison followed by three years of supervised release and impose $704,002 in restitution joint and severally with his codefendant Lewis.

DATED this 27th day of January, 2020.

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

//s// Patrick Burns
_____

PATRICK BURNS
Assistant United States Attorney

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I am an employee of the United States Attorney's Office. A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

DATED: this 27th day of January, 2020.

//s// Patrick Burns
_____
PATRICK BURNS
Assistant United States Attorney